Filed 5/14/26  P. v. Gomez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064790 |
| v. | (Super. Ct. No. 17NF0939) |
| EDDIE GOMEZ, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Kimberly Menninger, Judge. Affirmed.

Kenneth H. Nordin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Assistant Attorney General, Juliet W. Park, Deputy Attorney General, for Plaintiff and Appellant.

Defendant Eddie Gomez, Jr., appeals an order denying his petition for resentencing following an evidentiary hearing under Penal Code section 1172.6.[1] Gomez contends there is insufficient evidence to support the trial court's finding he is ineligible for resentencing because he directly aided and abetted an attempted murder committed by a fellow gang member. We disagree and affirm the court's denial order.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### THE CHARGES

In 2017, Gomez and Mario Diaz were jointly charged with two counts of attempted murder and one count of street terrorism. (§§ 664/187, subd. (a), 186.22, subd. (a).) The information alleged defendants were vicariously armed during the attempted murders and committed them with premeditation and for the benefit of a criminal street gang. (§§ 12022.53, subds. (c), (e)(1), 664, subd. (a), 186.22, subd. (b)(1)(C).) In addition, Gomez was alleged to have been on bail when the crimes occurred. (§ 12022.1, subd. (b).)

### II.

### GOMEZ'S GUILTY PLEA

After the preliminary hearing, Gomez pled guilty to one count of attempted murder and admitted he committed that offense while on bail and

---

[1] That section originally was housed in Penal Code section 1170.95, but it subsequently was renumbered without substantive change as Penal Code section 1172.6. (Stats. 2022, ch. 58, § 10.) For ease of reference, we refer to the current provision. All further statutory references are to the Penal Code.

for the benefit of his gang, Fullerton Tokers Town (FTT). Per Gomez's plea agreement, all other charges against him were dismissed, and he was sentenced to 11 years in prison.

As the factual basis for his guilty plea, Gomez admitted the following: "In Orange County, California, on January 28, 2017, I did unlawfully and with the specific intent to kill, attempt to murder John Doe, a human being, with a firearm. I committed this crime while a member and active participant of [FTT]. I willfully assisted, furthered or promoted felonious criminal conduct by members of [FTT] by directly committing the offense with two or more members of [FTT]. I also committed the offense for the benefit of, at the direction of, and in association with [FTT] with the specific intent to assist, further and promote criminal conduct by members of that gang. I know that [FTT] is a criminal street gang, with three or more members, that engages in a pattern of criminal activity as defined in [the Penal Code]."

III.

THE PRELIMINARY HEARING EVIDENCE

Gomez's preliminary hearing added considerable detail to the facts he admitted as part of his guilty plea. The prosecution's key witness at the hearing was Olivia Fanti, who was charged separately in connection with the shooting and testified pursuant to an agreement with the prosecution.

Fanti, who was 26 years old at the time of the preliminary hearing, testified she and Gomez were childhood friends who lost touch during high school but reconnected in January 2017, a few weeks before the

3

subject shooting took place. Around that time, Fanti also met Diaz and Alexis Lucas, who, like Gomez, were FTT members.

On the evening of January 27, 2017, the night before the shooting, Fanti partied with Gomez, Diaz, Lucas, and other FTT members at a Fullerton motel. The next morning, Fanti drove to her friend Galia's house and started drinking again. After finishing three tall beers there, Fanti drove to a liquor store with Galia to get more alcohol before meeting up with a group of people in the parking lot of a Fullerton taco shop.

The group included Gomez, Diaz, and Lucas. They were standing around talking with others at the rear of Fanti's car, while Fanti and Galia sat in the front seat listening to the radio. Fanti could not hear what Gomez and the others were saying, but at one point Lucas asked if she could give him a ride to the other side of Fullerton, and Fanti agreed to do so. At the preliminary hearing, Fanti testified she had no idea exactly where Lucas wanted to go or why he wanted to go there.

As it turned out, Gomez and Diaz decided to go with Lucas, as well. In fact, Gomez is the one who opened the rear doors of Fanti's car to allow Diaz and Lucas to get into the back seat. That is because the handles to both rear doors were broken, and Gomez was one of the few people who knew how to open them from the outside. After Gomez opened the rear passenger door, Lucas got into the back seat first. But Gomez told him to get out and go around to the other side of the car, which he did. Meanwhile, Gomez got in the middle of the back seat, and Diaz got in the seat to his right. Gomez then opened the other rear door for Lucas, and Lucas took a seat behind Fanti.

4

After that, Galia exited the front passenger seat, and Fanti set out from the taco shop with Gomez, Diaz, and Lucas in the back seat of her car.

As they were driving, the radio was on loud, so Fanti could not hear what her passengers were talking about in the back seat. Lucas was the primary person giving her directions. At some point along the way, however, Fanti could distinctly hear all three of them telling her where to go. After about 10 minutes, they ended up at Orangethorpe Park, which was then a known hangout for members of the Baker Street gang, a rival of FTT. Lucas directed Fanti to stop near a bench on which two males and a female were sitting. When she did, Lucas and Diaz exited the car, closing their doors behind them, and Gomez stayed in the car with Fanti.

From the driver's seat of her car, Fanti saw Lucas and Diaz walk toward the people on the bench. Lucas then pointed a gun at the people and fired two shots. Diaz was standing next to Lucas and appeared to be yelling something at the people, but Fanti could not make out what he was saying.

According to Fanti, Gomez was watching Lucas and Diaz from the back seat of her car when Lucas opened fire. Fanti asked Gomez in disbelief if "this"—meaning the shooting—was really happening, and he replied "hell yeah" in an excited voice, as if he were happy about it. Gomez then opened the rear doors for Lucas and Diaz as they scrambled back to Fanti's car. Once Lucas and Diaz retook their seats next to Gomez, all three started yelling at Fanti to go, so she hastily started driving.

As they were leaving the scene, Lucas laughingly stated, "I think I got those fools." He said he had hit someone from Lost For Life (LFL), which

is a tagging crew associated with the Baker Street gang. Lucas and Diaz were happy and excited, and Gomez was congratulating them. When Fanti dropped them off on a street corner about 10 minutes later, they told her not to tell anyone about the shooting.

Meanwhile, the police arrived at the park and contacted Miguel D., who had been shot in the back of the head. He said the shooter asked him if he was "banging"—meaning associated with a gang—before opening fire on him.

Fanti was arrested two months later. When questioned about the shooting, she initially lied about what happened to protect Lucas. But she eventually admitted Lucas was the shooter. Fanti also told the police she believed Gomez stayed in her car during the shooting so he could open the doors for Lucas and Diaz when they returned to the car.

At the preliminary hearing, the prosecution's gang expert testified that, by opening the doors for Lucas and Diaz after the shooting, Gomez was backing them up. The expert also opined the shooting benefitted FTT by inflicting violence on a person associated with a rival gang.

IV.

THE TRIAL COURT'S RULING ON GOMEZ'S RESENTENCING PETITION

In 2023, Gomez filed a petition for resentencing pursuant to section 1172.6. After finding Gomez had established a prima facie case for relief, the trial court conducted an evidentiary hearing on whether he was entitled to relief. Based on the preliminary hearing evidence and the factual basis for Gomez's guilty plea, the court determined Gomez was ineligible for resentencing because: (1) he aided and abetted the attempted murder of

6

Miguel D. with express malice; and (2) he aided and abetted the attempted murder of Miguel D. with implied malice. The court therefore denied Gomez's petition for relief.

## DISCUSSION

Gomez contends there is insufficient evidence to support the trial court's order. We disagree.

## I.

### APPLICABLE LEGAL PRINCIPLES AND STANDARD OF REVIEW

Murder is defined as the unlawful killing of a person with malice aforethought. (§ 187, subd. (a).) There are two kinds of malice, express and implied. Express malice requires the intent to kill, and implied malice exists when the defendant's life-threatening conduct evinces a conscious disregard for human life. (§ 188, subd. (a)(1) & (2); *People v. Collins* (2025) 17 Cal.5th 293, 310.) Either type of malice will satisfy the mens rea requirement for murder. (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) In contrast, attempted murder requires express malice. (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Attempted murder cannot be predicated on the theory of implied malice. (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Bland* (2002) 28 Cal.4th 313, 327.)

Imputed malice is a different concept altogether. It applies when the defendant personally lacks malice (express or implied), but malice is attributed to him due to his involvement in a joint criminal enterprise. For example, if A and B set out to commit a nonhomicide offense, and during the course of that offense B ends up committing a murder that is reasonably foreseeable under the circumstances presented, B's malice may be imputed to A under the natural and probable consequences theory of aiding and abetting. (See *People v. Chiu* (2014) 59 Cal.4th 155, 164–166.)

7

At least that is how the law worked for many years in California. In 2018, however, the Legislature passed Senate Bill No. 1437, which narrowed the scope of liability for the crime of murder. (Stats. 2018, ch. 1015, §§ 2–4 (Senate Bill 1437).) As relevant here, Senate Bill 1437 abolished the natural and probable consequences theory of aiding and abetting in murder cases. (§ 188, subd. (a)(3); *People v. Lewis* (2021) 11 Cal.5th 952, 957.) Senate Bill 1437 also enacted section 1172.6, which allows defendants who were convicted of murder or attempted murder to petition for resentencing. (§ 1172.6, subd. (a).)

To be eligible for resentencing, a defendant who pled guilty to attempted murder must show he was charged in a complaint that allowed the prosecution to proceed under the natural and probable consequences theory, he accepted a plea in lieu of going to trial, and he could not presently be convicted of attempted murder because of the changes ushered in by Senate Bill 1437. (§ 1172.6, subd. (a).)

If the defendant makes such a prima facie showing, the trial court is required to issue an order to show cause and conduct an evidentiary hearing. (§ 1172.6, subds. (c), (d).) At the hearing, the prosecution must prove beyond a reasonable doubt the defendant is ineligible for resentencing. In particular, the prosecution must prove that, notwithstanding Senate Bill 1437's changes, the defendant's conduct constituted attempted murder under a still-valid theory of liability, such as direct aiding and abetting. (§ 1172.6, subd. (d)(3); *People v. Gentile* (2020) 10 Cal.5th 830, 850.) Otherwise, the defendant is entitled to resentencing pursuant to the terms of section 1172.6. (See *id.*, subd. (e).)[2]

---

[2] Although hearsay evidence generally is admissible at the evidentiary hearing, the trial court is not permitted to consider hearsay

When the trial court denies a resentencing petition following an evidentiary hearing, we review the court's ruling for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) In doing so, we assess the evidence "'in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [court] could reasonably have deduced from the evidence.'" (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.) "'"If the circumstances reasonably justify the findings made . . . reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."'" (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.) "The [trial court's ruling] shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it]."'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

## II.

### ANALYSIS

One of the trial court's stated grounds for denying Gomez's petition was that he aided and abetted the attempted murder of Miguel D. with implied malice. But, as explained above, attempted murder requires *express* malice. Therefore, the trial court erred in finding Gomez ineligible for resentencing based on the theory of implied malice.

The Attorney General does not dispute this. However, he urges us to affirm the trial court's ruling on the alternative theory it relied on— aiding and abetting with *express* malice. (See *People v. Zapien* (1993) 4

evidence from a preliminary hearing that was admitted under Proposition 115. (§ 1172.6, subd. (d)(3).) Accordingly, the trial court in this case did not consider any such hearsay in ruling on Gomez's petition; nor did we include it in our statement of facts. As the trial court aptly put it, such evidence is not relevant to whether Gomez is eligible for resentencing relief.

9

Cal.4th 929, 976 [a trial court's decision must be affirmed if it is supported by any legal theory applicable in the case].) For the reasons explained below, we agree with the Attorney General there is substantial evidence to support the court's finding Gomez is ineligible for resentencing because he harbored express malice while aiding and abetting his cohorts in attempting to murder Miguel D.

Attempted murder under the theory of direct aiding and abetting "requires both a sufficient mens rea and a sufficient actus reus." (*People v. Curiel* (2023) 15 Cal.5th 433, 441.) Only the mens rea requirement is at issue here. To satisfy that requirement in this case, the prosecution had to prove Gomez possessed express malice, i.e., the intent to kill; he knew Lucas intended to kill; and he intended to assist Lucas in achieving that unlawful goal. (*Id.*, at p. 463; *People v. Ramos* (2024) 103 Cal.App.5th 460, 466 (*Ramos*).)

Gomez contends the admissions he made in the factual basis for his guilty plea prove only that the attempted murder of Miguel D. was carried out with the intent to kill, not that he personally harbored such intent. Based on that understanding, Gomez contends his plea was broad enough to encompass the now-invalid natural and probable consequences theory of aiding and abetting.

We are not persuaded. As part of the factual basis for his guilty plea, Gomez admitted in first-person language: "*I* did unlawfully and with the specific intent to kill, attempt to murder" Miguel D. (Italics added.) By using the singular pronoun "I," Gomez plainly conceded that he *personally*

10

possessed the intent to kill. That admission satisfies the malice requirement for attempted murder. (See *Ramos, supra,* 103 Cal.App.5th at p. 466.)[3]

The facts from the preliminary hearing are also probative of Gomez's intent, because they reveal how he interacted with his fellow gang members Diaz and Lucas before, during, and after the shooting. At the taco shop beforehand, Gomez talked with Diaz, Lucas, and others for several minutes at the rear of Fanti's car. Gomez also opened the rear doors of Fanti's car for Diaz and Lopez and directed them where to sit in the vehicle. And he joined them in giving Fanti directions to Orangethorpe Park, where members of a rival gang were known to congregate. This shows Gomez was actively involved in setting the stage for the attack that soon transpired.

Moreover, upon arriving at the park, Gomez watched from the back seat as Lucas and Diaz exited Fanti's car, walked toward Miguel D., and Lucas opened fire on him. When the bewildered Fanti asked Gomez if the shooting was really happening, he excitedly answered "hell yeah," as if he knew what Lucas was going to do and approved of him doing it. And when Lucas and Diaz ran back to the car after the shooting, Gomez opened their broken doors for them, facilitating their escape. Gomez also congratulated Lucas and Diaz after Lucas gleefully announced he had shot someone associated with their rival Baker Street.

---

[3] As Gomez correctly points out, the defendant in *Ramos* not only admitted he possessed the intent to kill, he also admitted he *abetted* the perpetrator in committing attempted murder, which is something Gomez did not admit as part of his plea. (*Ramos, supra,* 103 Cal.App.5th at p. 466.) In *Ramos*, however, the defendant's admission to abetting did not factor into the court's analysis of the express malice requirement. Instead, as we do here, the court found that requirement satisfied based on the defendant's admission he harbored the intent to kill. (*Ibid.*)

Although not dispositive, it is also telling that the gang expert opined Gomez acted as backup for Lucas and Diaz during the shooting, which implies Gomez knew what they were up to and intended to assist them in attempting to murder Miguel D. Suffice to say, there is sufficient evidence to support the trial court's finding in that regard.

In arguing otherwise, Gomez points to various weaknesses in Fanti's testimony, such as the fact she neither heard Gomez, Diaz, and Lucas discussing any murder plan nor saw a gun prior to the shooting. However, drawing all inferences in favor of the trial court's ruling—as we are required to do—we conclude there is substantial evidence Gomez not only intended to kill Miguel D., but knew Lucas and Diaz did too and willingly assisted them in carrying out that unlawful objective. Accordingly, there is no basis to disturb the trial court's ruling.

## DISPOSITION

The trial court's postjudgment order denying Gomez's petition for resentencing is affirmed.

GOODING, J.

WE CONCUR:

MOTOIKE, ACTING P. J.

DELANEY, J.

12